## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **BARRY D. TURNER, II,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION** |
| | ) | |
| **v.** | ) | **No. 11-2059-KHV** |
| | ) | |
| **NATIONAL COUNCIL OF STATE** | ) | |
| **BOARDS OF NURSING, INC., a** | ) | |
| **Pennsylvania Corporation,** | ) | |
| **STATE OF KANSAS by and through** | ) | |
| **KANSAS STATE BOARD OF** | ) | |
| **NURSING, JEANE WALSH,** | ) | |
| **JANET JACOBS, BERNARD BECKER,** | ) | |
| **JANE CONROY, JANICE McCART,** | ) | |
| **KIMBERLY HENSLEY, JUDITH HINER,** | ) | |
| **MARY CAROL POMATTO,** | ) | |
| **SERENA STUTZMAN,** | ) | |
| **BRENDA MOFFITT, GARY TAYLOR** | ) | |
| **and MARY BLUBAUGH,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

Plaintiff Barry Turner, II brings suit against the National Council of State Boards of Nursing, Inc., the Kansas State Board of Nursing and numerous Kansas State Board officers, members and employees in their official and individual capacities.[1]  Plaintiff alleges that defendants discriminated against him on the basis of disability and failed to provide reasonable accommodations regarding application for and administration of the Kansas nursing licensing examination.  He seeks damages and injunctive relief under the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq.  This

---

[1]     The individual defendants are State Board President Jeane Walsh; State Board members Janet Jacobs, Bernard Becker, Jane Conroy, Janice McCart, Kimberly Hensley, Judith Hiner, Mary Carol Pomatto, Serena Stutzman and Brenda Moffitt; and State Board employees Gary Taylor and Mary Blubaugh.

matter comes before the Court on <u>Defendant National Council of State Boards Of Nursing, Inc.'s</u> <u>Motion To Dismiss</u> (Doc. #28) filed September 19, 2011, the <u>Motion To Dismiss</u> (Doc. #30) which the State Board and its officers and members filed September 19, 2011, the <u>Motion Of Defendant Blubaugh</u> <u>To Dismiss</u> (Doc. #46) filed November 14, 2011 and the <u>Motion Of Certain Defendants To Quash</u> <u>Untimely Service Of Process</u> (Doc. #47) filed November 14, 2011.  For reasons set forth below, the Court finds that the motion to quash should be overruled and that the motions to dismiss should be sustained.[2]

### <u>Legal Standards</u>

In ruling on a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., the Court assumes as true all well-pleaded factual allegations and determines whether they plausibly give rise to an entitlement of relief.  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 679 (2009).  To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim which is plausible – and not merely conceivable – on its face.  <u>Id.</u>; <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007).  In determining whether a complaint states a plausible claim for relief, the Court draws on its judicial experience and common sense.  <u>Iqbal</u>,  556 U.S. at 679.

The Court need not accept as true those allegations which state only legal conclusions.  <u>See id.</u>; <u>Hall v. Bellmon</u>, 935 F.3d 1106, 1110 (10th Cir. 1991).  Plaintiff bears the burden of framing his complaint with enough factual matter to suggest that he is entitled to relief; it is not enough to make threadbare recitals of a cause of action accompanied by conclusory statements.  <u>Twombly</u>, 550 U.S. at 556.  Plaintiff makes a facially plausible claim when he pleads factual content from which the Court can reasonably infer that defendants are liable for the misconduct alleged.  <u>Iqbal</u>, 556 U.S. at 678.  Plaintiff

---

[2]        Defendant Taylor does not join in any of the motions so the Court takes no action with regard to claims against him.  Thus, any reference to "defendants" excludes Taylor.

must show more than a sheer possibility that defendants have acted unlawfully – it is not enough to plead facts that are "merely consistent with" defendants' liability. Id. (quoting Twombly, 550 U.S. at 557). A pleading which offers labels and conclusions, a formulaic recitation of the elements of a cause of action, or naked assertions devoid of further factual enhancement will not stand. Iqbal, 556 U.S. at 678. Similarly, where the well-pleaded facts do not permit the Court to infer more than the mere possibility of misconduct, the complaint has alleged – but has not "shown" – that the pleader is entitled to relief. Id. at 679. The degree of specificity necessary to establish plausibility and fair notice depends on context, because what constitutes fair notice under Rule 8(a)(2), Fed. R. Civ. P., depends on the type of case. Robbins v. Oklahoma, 519 F.3d 1242, 1248 (10th Cir. 2008) (quoting Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231-32 (3d Cir. 2008)).

### Factual Background

The amended complaint alleges the following facts:

At an early age, Barry D. Turner was diagnosed with dyslexia, a condition that impairs an individual's ability to accurately interpret and organize graphic symbols, including letters. During his education, Turner received a variety of educational services and accommodations for examinations, including extra time, a private room and readers.[3] Turner attended the nursing program at Bethel College in North Newton, Kansas. In February of 2007, Turner earned a bachelor's degree in nursing from Bethel College. The Department of Nursing at Bethel found that Turner's dyslexia did not adversely affect his ability to practice nursing if he received reasonable accommodations for tests.

The National Council of State Boards of Nursing, Inc. ("National Council") provides an opportunity for state and territorial boards of nursing to act together and counsel on matters of common

---

[3]        Plaintiff has "test-taking anxiety," which is common in individuals who have dyslexia.

interest and concern affecting public health, safety and welfare.  The National Council developed the NCLEX-RN licensure examination.  In 1994, the National Council implemented the NCLEX-RN in a computer adaptive testing (CAT) format.

The Kansas State Board of Nursing ("State Board") controls nurse licensing in Kansas.  See K.S.A. § 65-1115 et seq. The State Board requires each applicant to pass the NCLEX-RN in the CAT format.  See K.A.R. § 60-3-101(a)(3).  Jeane Walsh is President of the State Board.  Janet Jacobs, Bernard Becker, Jane Conroy, Janice McCart, Kimberly Hensley, Judith Hiner, Mary Carol Pomatto, Serena Stutzman and Brenda Moffitt are members of the State Board.  Mary Blubaugh is Executive Administrator of the State Board and Gary Taylor is a former employee of the State Board.

In April of 2008, Turner contacted Gary Taylor at the State Board to request to take the NCLEX-RN in May of 2009 with accommodations including extra time, a private room and a reader.  Taylor advised Turner that he would "take care of these requests."  Taylor imposed three conditions for Turner to take the exam with accommodations: (1) proof through school records that Turner has dyslexia; (2) confirmation from Bethel that it had provided Turner the requested accommodations; and (3) a letter from Turner setting out his requests regarding accommodations.  Taylor told Turner that he would let Turner know when to submit these materials.  Taylor also told Turner that in his 30 years with the State Board, no applicant had requested accommodations.

During 2008, Turner took test preparation courses offered by the National Council, Kaplan and Assessment Technologies Institute.  In November of 2008, Turner applied to take the NCLEX-RN in Kansas.  The application form did not ask whether the applicant had disability and if so, any accommodations the applicant requested.  In the last week of February of 2009, Turner contacted Taylor about submitting materials related to his dyslexia.   Taylor told Turner that if he received

-4-

accommodations and passed the licensure examination, his nursing license would be restricted and limited.[4]

In March of 2009, Turner contacted the office of the State Board about "submitting the materials for his requested accommodation." Amended Complaint at 6. The State Board told him that Taylor no longer worked for the State Board but had left a note stating that Turner was planning to take the license examination in May of 2009. The State Board also told Turner that it had no knowledge that he had requested any accommodations.[5]

In May of 2009, Turner took the NCLEX-RN without accommodations. Turner failed the test. He asserts that "[i]f a private room had been made available . . . as an accommodation for taking the test, there would have been no need for electronic monitoring, only periodic monitoring by the test proctor, thus reducing his test anxiety." Amended Complaint (Doc. #24) at 6. He also asserts that problems existed with the CAT format of the NCLEX-RN in May of 2009.[6]  Specifically, although the CAT format required a test-taker to answer at least 75 questions, the CAT system inexplicably shut down after Turner had answered only 57 questions. But the National Council's report of Turner's test performance erroneously indicated that he had answered 84 questions.

Turner asked the State Board and the National Council about appealing the test result. Both

---

[4] The complaint alleges that Taylor imposed this prospective condition without any evidence that Turner could not successfully practice as a registered nurse.

[5] Taylor never informed Turner that he would be leaving the State Board or who would be taking over his responsibilities.

[6] Academic research has revealed significant flaws with the CAT format, including flaws that relate to those who suffer from test-taking anxiety. Partly for that reason, the national boards of medicine continue to administer standardized testing in the static medium of pencil and paper. Because of complaints to the National Council about the high number of NCLEX-RN test failures, the National Council held a meeting in September of 2009 to discuss changing the pass/fail standard for the test.

agencies told him that there was no point in appealing because no test result had ever been changed. As a result, Turner cannot earn an income as a licensed, registered nurse in Kansas or in any other state. On January 31, 2011, Turner filed this lawsuit.  On September 2, 2011, he filed an amended complaint.

Plaintiff brings seven ADA claims against the State Board and its members and employees in their official and individual capacities (collectively, the "Kansas Defendants").  Doc. #24, Counts I-VII. For each claim, plaintiff seeks monetary damages of more than $75,000 and unspecified declaratory and injunctive relief.[7]  Turner also asserts two ADA claims against the National Board for injunctive relief only.  Id., Counts VI, VII.

In Count I, plaintiff asserts that because the Kansas Defendants failed to provide a location on the nursing exam application for an applicant to describe disabilities and request accommodations, they discriminated against disabled individuals, including plaintiff, by excluding them from the benefits of the nursing license program in violation of 42 U.S.C. § 12132.

In Count II, plaintiff asserts that because the Kansas Defendants denied reasonable accommodations for the nursing license examination, they discriminated against him as a disabled person by excluding him from the benefits of the license program in violation of 42 U.S.C. § 12132.

In Count III – which appears almost identical to Count II – plaintiff asserts that the Kansas Defendants failed to provide him reasonable accommodations during the nursing license examination and thereby discriminated against him as a disabled person by excluding him from the benefits of the license program in violation of 42 U.S.C. § 12132.

In Count IV, plaintiff asserts that the threat of a license restriction by the Kansas Defendants

---

[7]     Plaintiff also seeks costs, litigation expenses, a reasonable attorney fee and pre-judgment interest.

deterred him from pursuing his request for reasonable accommodations in taking the nursing license examination and thus deprived him of a level playing field in taking the exam and discriminated against him as a disabled person by excluding him from the benefits of the license program in violation of 42 U.S.C. § 12132.

In Count V, plaintiff asserts that the threat of a license restriction by the Kansas Defendants prospectively interfered with his practice of nursing and thus discriminated against him as a disabled person by excluding him from the benefits of the license program in violation of 42 U.S.C. § 12132.

In Count VI, plaintiff alleges that because all defendants failed to provide an appeal procedure for applicants and takers of the NCLEX-RN, they discriminated against disabled individuals, including plaintiff, by excluding them from the benefits of the license program in violation of 42 U.S.C. §§ 12132 and 12189.

In Count VII, plaintiff alleges that the failure of the all defendants to provide an alternative format to the CAT format for test-takers of the NCLEX-RN had the effect of discriminating against disabled individuals, including plaintiff, by excluding them from the benefits of the license program in violation of 42 U.S.C. §§ 12132 and 12189.

## Analysis

Defendants assert that the Court should dismiss all of plaintiff's claims. As a preliminary matter, the individual defendants move to quash service for insufficiency of service of process and to dismiss without prejudice plaintiff's claims against them in their individual capacities. All of the Kansas Defendants assert that they are entitled to absolute legislative immunity and sovereign immunity from plaintiff's claims for money damages. The individual defendants in their official capacities assert that plaintiff has failed to state a claim for injunctive relief under Ex Parte Young, 209 U.S. 123, 168 (1908).

The individual defendants also assert that plaintiff has failed to state a claim against them in their individual capacities because they are not "entities" under the ADA.[8]  Finally, the National Council asserts that plaintiff lacks standing to raise his claims against it and that he fails to set forth a claim because he has not alleged that he asked the Council for an accommodation, or that any action by the Council caused him harm.[9]

## I.   <u>Motion To Quash</u>

Plaintiff filed his original complaint on January 31, 2011, naming as defendants the National Board, the State Board and the State Board president and members in their official and individual capacities.  Plaintiff initially directed service of process of the individual defendants through the State Board and did not accomplish personal service as directed by Rule 4, Fed. R. Civ. P., or Kan. Stat. Ann. § 60-303.  <u>See</u> <u>Bell v. City of Topeka</u>, No. 06-4026-JAR, 2007 WL 628188, at *2-3 (D. Kan. Feb. 26, 2007) (must accomplish personal service of government officials to obtain personal jurisdiction as to personal capacity claims).

On September 2, 2011, plaintiff filed an amended complaint which added claims against two State Board employees, Blubaugh and Taylor.  Between October 26 and 28, 2011, plaintiff properly served each individual defendant except Jane Conroy, Janice McCart and Gary Taylor with a copy of the amended complaint by certified mail.

Defendants move to quash personal service on the individual defendants and to dismiss without

---

[8]     The individual defendants also assert that plaintiff has not sued them in their individual capacities.  Although the caption does not name them in their individual capacities, the body of the Amended Complaint states that plaintiff sues each in his or her individual capacity.

[9]     The National Council also asserts that Count VI fails to state a claim against it because the Council is not a "public entity" under 42 U.S.C. §12132.  Plaintiff responds that he does not assert a claim against the Council under Section 12132, and this issue is therefore moot.

prejudice for insufficiency of service of process plaintiff's claims against them in their individual capacities.  Specifically, they argue that plaintiff failed to effect service of process within the time limit set by Federal Rule of Civil Procedure 4(m), which provides as follows:

> Time Limit for Service. If a defendant is not served within 120 days after the complaint is filed, the court – on motion or on its own after notice to the plaintiff – must dismiss the action without prejudice against that defendant or order that service be made within a specified time.  But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.  This subdivision (m) does not apply to service in a foreign country under Rule 4(f) or 4(j)(1).

Fed. R. Civ. P. 4(m).

Plaintiff concedes that he did not serve the individual defendants within 120 days as required by Rule 4(m).  He asserts that the individual defendants waived the issue of untimely service, however, because they did not raise it in their answer and motion to dismiss.  Defendants point out that they raised the issue of improper service in their answer, but did not raise timeliness because at that juncture it was not apparent that any future attempt at service would necessarily be untimely.  And on September 19, 2011, they filed a motion seeking dismissal because plaintiff had not served them as required by Kansas law.  See Scherer v. United States, 241 F. Supp.2d 1270, 1281-82 (D. Kan. 2003) (district court properly dismissed defendant in individual capacity because Rule 4(e) requires personal service when defendant named individually).  Further, plaintiff has not filed a motion asking for an extension of time to properly serve the individual defendants, and has not set forth good cause for an extension as required under D. Kan. Rule 6.1(a).  The individual defendants therefore argue that the Court must dismiss plaintiff's claims against them in their individual capacities without prejudice.  See Fed. R. Civ. P. 4(m) (court must dismiss action without prejudice or order that service be made within specified time).

Rule 4(m) requires the Court to undertake a two-part analysis.  See Stewart v. Tenn. Valley Auth., 238 F.3d 424, No. 99-5723, 2000 WL 1785749, at *1 (6th Cir. Nov. 21, 2000).  First, the Court

must determine whether plaintiff has shown good cause for failure to effect service, and if so, "the court *shall* extend the time for service for an appropriate period." Id. (quoting Fed. R. Civ. P. 4(m)). Second, if plaintiff has not shown good cause, the Court must either (1) dismiss the action or (2) direct that plaintiff effect service within a specified time. Id. In other words, the Court has discretion to permit late service even absent a showing of good cause. Id. (citing Henderson v. United States, 517 U .S. 654, 662 (1996) (discretion to enlarge 120-day period even without good cause shown)).

Here, the apparent lack of prejudice in permitting the case to proceed and the potential waste of resources caused by dismissal without prejudice suggest that the Court should not dismiss the case without prejudice. See John W. Stone Oil Distrib., LLC v. PBI Bank, Inc., No. 3:09-CV-862-H, 2010 WL 3221800, at *1 (W.D. Ky. Aug. 12, 2010) (if court dismisses claim without prejudice, plaintiff free to re-file and simply re-effect service of process.). The individual defendants will not be prejudiced by allowing this action to proceed, as opposed to dismissing without prejudice and requiring plaintiff to re-file. The Court therefore extends the time limitation for effecting service of process through the time of actual service, which was effectuated as to most individual defendants between October 26 and 28, 2011**.**

As to Conroy and McCart, it appears that no service has been made.  As set forth below, however, none of plaintiff's claims against the individual defendants are actionable.  Allowing plaintiff to serve these defendants would therefore be futile.  Accordingly, the Court dismisses plaintiff's complaint against Conroy and McCart pursuant to Rule 12(b)(5).[10]  A dismissal pursuant to Rule 12(b)(5) is ordinarily without prejudice, see Gregory v. U.S. Bankr. Court, 942 F.2d 1498, 1500 (10th

---

[10]     As noted, Taylor does not join in defendants' motion to dismiss and the Court therefore takes no action on his behalf.

Cir. 1991) (when service insufficient but curable, court generally should quash service and give plaintiff opportunity to re-serve defendant), but in this case the dismissal is with prejudice because plaintiff also has failed to state a claim on which relief may be granted.

## II.     **Motions To Dismiss**

As noted, plaintiff brings claims under Title II and Title III of the ADA.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "qualified individual with a disability" means "an individual with a disability who, with or without reasonable modification to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). Title II authorizes suits by private citizens for money damages against public entities that violate Section 12132. 42 U.S.C. § 12133 (incorporating by reference 29 U.S.C. § 794a). To state a claim under Title II, plaintiff must allege that (1) he is a qualified individual with a disability, (2) he was excluded from participation in or denied the benefits of a public entity's services, programs or activities, and (3) such exclusion, denial of benefits or discrimination was by reason of a disability. Cohon ex rel. Bass v. N.M. Dep't of Health, 646 F.3d 717, 725 (10th Cir. 2011); see 42 U.S.C. § 12132.

Title III of the ADA prohibits discrimination against disabled individuals "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a); see Doe v. Okla. City Univ., 406 F. App'x. 248, 250,

No. 10-6020, 2010 WL 5395011, at * 2 (10th Cir. Nov. 2, 2010).  To set forth a Title III claim, plaintiff must allege that (1) he is disabled within the meaning of the ADA; (2) defendant is subject to the ADA; and (3) defendant discriminated against plaintiff within the meaning of the ADA.  Roberts v. Royal Atl. Corp., 542 F.3d 363, 368 (2d Cir. 2008).[11]  Section 12189 of Title 42, which falls within Title III, governs professional licensing examinations, and requires entities which offer such examinations "related to applications, licensing, certification, or credentialing for . . . professional, or trade purposes" to "offer such examinations . . . in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals."  42 U.S.C. § 12189; see Enyart v. Nat'l Conf. of Bar Exam'rs, 630 F.3d 1153, 1160 (9th Cir. 2011) (Section 12189 ensures that disabled persons not foreclosed from educational, professional or trade opportunities by examination or course conducted in inaccessible site or without accommodation).

## A.    **Legislative Immunity**

The State Board members assert that, to the extent plaintiff claims that the State Board has "failed to enact a rule or regulation granting him the rights he desires," legislative immunity shields them from plaintiff's claims for money damages and injunctive relief.[12]  Doc. #30 at 2.  Plaintiff responds that he does not sue the State Board members for legislative actions and that they therefore are not entitled to absolute immunity.

Legislators are absolutely immune from suit for legislative activities.  See Bogan v. Scott-Harris,

---

[11]        "Discrimination under Title III specifically includes the failure to make reasonable modifications in policies, practices, or procedure to accommodate a disabled individual, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of the services."  Doe, 406 F. App'x. at 250 (quoting Mershon v. St. Louis Univ., 442 F.3d 1069, 1076 (8th Cir. 2006)); 42 U.S.C. § 12182(b)(2)(A)(ii)).

[12]        It is not clear whether the State Board itself also claims legislative immunity, but in any event legislative immunity is not available to the State entity.

523 U.S. 44, 49 (1998).  Legislative immunity extends to non-legislative officials if their conduct involves the performance of legislative functions.  See id. at 54-55.  Whether an act is legislative depends on the nature of the act.  Id. at 54.  Legislative acts include voting on legislation, resolutions and ordinances; proposing and signing legislation; and conducting legislative investigations.  Borde v. Bd. of Cnty. Comm'rs of Luna Cnty, N.M., 423 F. App'x. 798, 801 (10th Cir. 2011); see Kamplain v. Curry Cnty. Bd. of Comm'rs, 159 F.3d 1248, 1251-52 (10th Cir. 1998) (at core, legislative function involves determining, formulating and making policy).  Officials are not legislatively immune from suit for performing administrative actions which do not concern the enactment or promulgation of public policy.  See Sable v. Myers, 563 F.3d 1120, 1125 (10th Cir. 2009); see also Kamplain, 159 F.3d at 1252 (decision to ban plaintiff from future meetings not legislative because circumstances did not concern enactment or promulgation of public policy).

The Supreme Court has been careful not to extend the scope of legislative immunity protection "further than its purposes require."  Forrester v. White, 484 U.S. 219, 224, 227 (1988) (to determine whether particular task is legislative, executive or judicial, court looks to function performed and defendant's title).  A government official seeking immunity bears the burden of showing that such immunity is justified for the function in question.  Borde, 423 F. App'x. 798, 801 (10th Cir. 2011).

The State Board asserts that legislative immunity is available to executive branch officials who draft and pass legislation.  Doc. #30 at 2.  Plaintiff correctly points out, however, that the cases on which the Board members rely do not involve a challenge to state administrative agency action.  See, e.g., Bogan, 523 U.S. at 47 (members of city council and mayor); Tenney v. Brandhove, 341 U.S. 367, 378-79 (1951); (members of California legislature); Sable, 563 F.3d at 1127 (10th Cir. 2009) (city council members); Calvert v. Safranek, 209 F. App'x. 816, 819-20 (10th Cir. 2006) (member of county

commission);[13] <u>Kamplain</u>, 159 F.3d at 1250 (members of county commission).  Plaintiff points out that

in <u>Bogan</u>, the Supreme Court simply held that local officials (a mayor and a city council member) could

receive legislative immunity.  523 U.S. at 46.  Plaintiff argues that "this is too thin a reed to support the

sweeping structurally horizontal extension of legislative immunity to executive branch officials."  Doc.

#34 at 4.  The State Board members cite no responsive authority for the proposition that legislative

immunity extends to the drafting and approval of administrative regulations by a state agency.  Further,

as plaintiff points out, the State Board members provide no information as to how and when they

participated in drafting and/or passage of the Kansas nursing board statutes or regulations.  The Court

finds that the State Board members have not met their burden of establishing legislative immunity.

**B.**     **Claims Against The State Board And The Individual Defendants in Their Official Capacities – Eleventh Amendment Immunity**[14]

The Kansas Defendants assert that under the Eleventh Amendment they are entitled to immunity

on all claims for money damages because Title II of the ADA abrogates that immunity only where the

alleged ADA violation also violates plaintiff's rights under the Fourteenth Amendment.  Plaintiff argues

that Title II of the ADA abrogates Eleventh Amendment immunity because his claims implicate his

Fourteenth Amendment rights to access to the Courts and to equal protection.

Under the Eleventh Amendment doctrine of sovereign immunity, private individuals may not

sue nonconsenting states in federal court.  <u>Opala v. Watt</u>, 454 F.3d 1154, 1157 (10th Cir. 2006) (citing

---

[13]     Plaintiff points out that the State Board members misread <u>Calvert</u> as extending legislative immunity to an executive branch official.  In <u>Calvert</u>, the court granted legislative immunity to a defendant – a county attorney at the time of the lawsuit – who was a county commissioner when the ordinance in question was passed.  <u>See</u> 209 F. App'x. at 819-20.

[14]     After the initial briefing, the Tenth Circuit decided <u>Guttman v. Khalsa</u>, 669 F.3d 1101 (10th Cir. Jan. 11, 2012), which addressed the test to determine whether Title II of the ADA validly abrogates state sovereign immunity in a particular case.  The Court therefore allowed the parties to file additional briefs addressing <u>Guttman</u>.

Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 363 (2001)).  This protection extends to government entities that function as "arms of the state."  Ambus v. Granite Bd. of Educ., 995 F.2d 992, 994 (10th Cir. 1993).  Further, in all respects other than name, an official-capacity suit is a suit against the entity.  Kentucky v. Graham, 473 U.S. 159, 166 (1985).  The Eleventh Amendment thus bars a request for money damages against the state and state officers in their official capacities.  See White v. Colo., 82 F.3d 364, 366 (10th Cir. 1996).[15]

Congress may abrogate state sovereign immunity in federal court, however, "if it makes its intention to abrogate unmistakably clear in the language of the statute and acts pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment."  Nev. Dep't of Human Res. v. Hibbs, 538 U.S. 721, 726 (2003).  Section 1 of the Fourteenth Amendment provides that "No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws," and Section 5 provides that "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."  U.S. Const. amend. XIV. Section 5 gives Congress authority to enact "prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct," so long as these measures do not work a substantive change in the governing law.  Hibbs, 538 U.S. at 727–28.

In Guttman v. Khalsa, 669 F.3d 1101 (10th Cir. 2012), the Tenth Circuit addressed  the circumstances in which Title II of the ADA is a valid exercise of congressional power to abrogate Eleventh Amendment immunity.  Guttman summarized the close scrutiny which the Supreme Court applies to legislation under Section 5 to prevent Congress from overreaching into essentially state

---

[15]      A valid claim of sovereign immunity implicates the Court's subject matter jurisdiction.  See Trans Shuttle, Inc. v. Pub. Utils. Comm'n, 24 F. App'x. 856, 858 (10th Cir. 2001) (citing Thompson v. Colo., 258 F.3d 1241, 1245 (10th Cir. 2001)) (under circuit precedent, claim of Eleventh Amendment immunity challenges subject matter jurisdiction of district court)).

governmental functions, as follows:

> For "private individuals to recover money damages against the States, there must be a pattern of discrimination by the States which violates the Fourteenth Amendment, and the remedy imposed by Congress [such as the ADA] must be congruent and proportional to the targeted violation." Garrett, 531 U.S. at 374, 121 S. Ct. 955; see also City of Boerne v. Flores, 521 U.S. 507, 520, 117 S. Ct. 2157, 138 L. Ed.2d 624 (1997).  The Court has not arrived at a concrete definition of congruence and proportionality, but it is clear that Congress enjoys greater power under § 5 when it responds to a clearly discernible pattern of state encroachment on fundamental or other important constitutional rights. See Tennessee v. Lane, 541 U.S. 509, 529, 124 S. Ct. 1978, 158 L. Ed.2d 820 (2004) (where a right is implicated that is subject to a heightened standard of judicial scrutiny, "it [is] easier for Congress to show a pattern of state constitutional violations than in [cases that] concern [ ] legislation that target[s] classifications subject to rational-basis review").  Congressional regulation is less likely to be congruent and proportional if the rights at issue are not subject to heightened judicial scrutiny. See id.

Guttman, 669 F.3d at 1112.  The Tenth Circuit then cited Supreme Court cases which have addressed Eleventh Amendment challenges to the ADA "with varying results."  Id. (citing United States v. Georgia, 546 U.S. 151 (2006); Tennessee v. Lane, 541 U.S. 509 (2004); Garrett, 531 U.S. at 374).

In Lane, the Supreme Court found that "Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment."  541 U.S. at 532 n.20.  It specifically declined, however, to address "whether Title II's duty to accommodate exceeds what the Constitution requires in the class of cases that implicate only [the] prohibition on irrational discrimination."  Id. at 532 n. 20, 533–34.[16]  In Guttman, the Tenth Circuit noted that Lane did not resolve whether the accommodation requirement of Title II is a valid exercise of Section 5 authority, as it applies to professional licensing. The Tenth Circuit then set out the three-step analysis to determine abrogation.  Specifically, it held that

---

[16]       The Supreme Court recently found that Congress did not constitutionally abrogate states' Eleventh Amendment immunity when it passed the self-care leave provision of the Family and Medical Leave Act, 29 U.S.C § 2612(a)(1)(D).  Coleman v. Md. Court of Appeals, 132 S. Ct. 1327 (2012).  The Court stated that "[t]o abrogate the States' immunity from suits for damages under § 5, Congress must identify a pattern of constitutional violations and tailor a remedy congruent and proportional to the documented violations."  Id. at 1338.

on a claim-by-claim basis, the Court must examine the following factors:

> (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

Guttman, 669 F.3d at 1113 (quoting Georgia, 546 U.S. at 159). If a court reaches the third step, it must

ask "whether Congress unequivocally expressed its intent to abrogate that immunity" and, "if it did,

whether Congress acted pursuant to a valid grant of constitutional authority." Lane, 541 U.S. at 517.

The Court thus applies this analysis to the Title II claims in this case.

Step One: The Alleged Title II Violations

The first step requires the Court to identify the State Board's conduct that allegedly violated the

Title II prohibition against disability discrimination in the provision of state services or programs. 546

U.S. at 159. As noted above, the complaint alleges that the State Board violated Title II in seven

separate respects. Essentially, however, the seven counts allege varying theories of one fundamental

claim – that the Board's failure to provide reasonable accommodations for plaintiff to take the nursing

licensing examination and the threat to restrict any license he earned through testing with

accommodations denied him the benefits of the licensing program on the basis of disability.[17]

Step Two: Fourteenth Amendment Claims

The second step requires the Court to assess the "asserted Fourteenth Amendment claims." In

---

[17]     See Amended Complaint (Doc. #24), Count I (failed to provide space on exam application to request accommodations); Count II (threat of license restriction deterred plaintiff from pursing accommodations); Count III (failed to provide accommodations during exam); Count IV (threat of license restriction deterred plaintiff from pursuing accommodations which deprived him of level playing field in taking exam); Count V (threat of license restriction prospectively interfered with plaintiff's practice of nursing); Count VI (failure to provide appeal procedure for test applicants and takers) and Count VII (failure to provide alternative test format).

<u>Guttman</u>, plaintiff brought constitutional claims under Section 1983 as well as an ADA claim, and thus clearly identified the asserted Fourteenth Amendment claims.  See <u>Guttman</u>,  669 F.3d at 1108. (amended complaint included ADA, equal protection, procedural due process, First Amendment retaliation and "stigma plus" claims plus claim for injunctive relief).  Here, the amended complaint alleges no constitutional claims.  Indeed, it does not refer to the Fourteenth Amendment or any other constitutional rights.  See <u>Amended Complaint</u> (Doc. #24).  In his briefs, plaintiff alludes to two possible Fourteenth Amendment claims: (a) a substantive due process claim based on the fundamental right of access to the courts, see <u>Lane</u>, 541 U.S. at 523, and (b) an equal protection claim based on the assertion that the State Board's treatment of plaintiff on the basis of disability lacked a rational basis, see <u>Garrett</u>, 531 U.S. at 365.  Doc. #34 at 5, Doc. #59 at 2.

If these claims allege constitutional violations, the State Board cannot raise a sovereign immunity defense because "insofar as Title II creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity."  <u>Georgia</u>, 546 U.S. at 159.  If the State Board's actions did not violate the Fourteenth Amendment, however, plaintiff merely alleges violations of Title II and the Court must proceed to the final step to determine if Congress validly abrogated the Board's sovereign immunity. See <u>Guttman</u>, 669 F.3d at 1113.

a) <u>Substantive Due Process: Deprivation of Right to Access to the Courts</u>

Relying on the Supreme Court ruling in <u>Lane</u>, which held that Title II validly abrogated the state's sovereign immunity as it applies to "that class of cases," plaintiff claims that the Kansas Defendants violated his right of access to the courts.  See 541 U.S. at 533.  Plaintiff asserts that all of his Title II claims implicate the "fundamental right of access," as follows:

The application process of the Kansas State Board of Nursing for a nursing license and

the taking of the NCLEX-RN are not completed in courts, courthouses or courtrooms as was at issue with the plaintiffs in <u>Lane</u>.  However, the process involved with the KSBN and the NCLEX-RN involve judging through qualification for fitness for practice in the application process and testing in the administration of the examination of subject-matter knowledge.  Counts I, deficiency in the application form, II, the denial of reasonable accommodations, III, the actual failure to provide reasonable accommodations, VI, the failure to provide an appeal procedure and VII, the failure to provide an alternative examination format all implicate the fundamental right of access.

Doc. #59 at 2.  The Court does not believe that the right to access to the courts is so broad.  In <u>Lane</u>, plaintiffs contended that they could not take advantage of the courts because they had no physical access to court buildings.  Here, the amended complaint does not allege facts that raise any issue of access to the courts.  The mere mention of access to the courts does not create a Fourteenth Amendment claim based on the fundamental right to access to the courts.  Plaintiff has not sufficiently alleged denial of access to the courts which would abrogate the Kansas Board's sovereign immunity.

### b) Equal Protection claims

Plaintiff alleges that the Board violated his equal protection rights by treating him differently because of disability.  He points out that "the Equal Protection Clause of the Fourteenth Amendment requires that the States' treatment of the disabled meet a rational basis test."  Doc. #59 at 3.  Plaintiff contends that Count IV, the threat of a license restriction, and Count V, the threat of license restriction as an interference with the prospective practice of nursing, do not pass the rational basis test.  He asserts that "[i]n placing this threat on Mr. Turner, the [Kansas Board] prejudged Mr. Turner's abilities as a nurse without any evidence of Mr. Turner being a threat to anyone's health and safety," and that "[t]he ADA was designed to root out this kind of rank discrimination."  <u>Id.</u>

The Equal Protection Clause essentially directs that all similarly situated persons should be treated alike.  <u>City of Cleburne, Tex. v. Cleburne Living Ctr.,</u> 473 U.S. 432, 439 (1985).  Although certain classifications – such as race or national origin – are subject to strict scrutiny and will be

sustained only if they are suitably tailored to serve a compelling state interest, the Fourteenth Amendment does not require states to make special accommodations for the disabled, so long as their actions towards such individuals are rational.  Garrett, 531 U.S. at 366-67.

Here, the parties do not adequately address whether a prospective (but undefined) restriction on plaintiff's potential nursing license – if he took and passed the test with accommodations – passes the rational basis test.[18]  Rational basis review begins with a strong presumption of constitutional validity, however, and plaintiff carries the burden to show that the law, as applied, is arbitrary.  Graham v. Mukasey, 519 F.3d 546, 551 (6th Cir. 2008) (government does not have burden to establish rationality). Moreover, under rational basis review, a court must uphold differential treatment against equal protection challenge "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  Heller v. Doe ex rel. Doe, 509 U.S. 312, 320 (1993).  Here, the Court easily finds that some set of facts could provide a rational basis for imposing restrictions on a nursing license earned through accommodations.  Specifically, restrictions on a nursing license earned by testing with accommodations could meet legitimate public safety and health concerns.

Because the Court finds that plaintiff has not alleged a Fourteenth Amendment violation, his claims against the State Board must rest solely on Title II violations.  Plaintiff contends that the Board's failure to provide reasonable accommodations for the nursing licensing examination, as well as the threat to restrict any license he might have earned through testing with accommodations, denied him the

---

[18]     It is not clear whether plaintiff raises a facial challenge or an as-applied challenge to the constitutionality of the alleged threat to impose restrictions on a license earned through accommodated testing, but the same rational basis standard applies to either.  See Heller, 509 U.S. at 320.

      Further, the Court notes that plaintiff has no procedural due process rights to a nursing license. See Women's Med. Prof. Corp. v. Baird, 438 F.3d 595, 611 (6th Cir. 2006) (first-time license applicants have no property or liberty interest subject to procedural due process rights).

benefits of the licensing program in violation of Title II.

Step Three: Sovereign Immunity Analysis

Under the Fourteenth Amendment, the State Board may be subject to suit under Title II of the ADA even if plaintiff does not allege a Fourteenth Amendment violation.  See Lane, 541 U.S. at 523. This is because Congressional power to enact remedial legislation under Section 5 of the Fourteenth Amendment is broad and includes "the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct" than that which the Amendment itself proscribes.  Guttman, 669 F.3d at 1116 (quoting Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 81 (2000)).  Legislation which deters or remedies constitutional violations can fall within Congress' enforcement power even if it prohibits conduct which is not itself unconstitutional and "intrudes into legislative spheres of autonomy previously reserved to the States."  City of Boerne, 521 U.S. at 518.

Congress may abrogate state sovereign immunity if Congress (1) unequivocally indicates its intent to abrogate state sovereign immunity, and (2) acts pursuant to a valid grant of constitutional authority under Section 5.  Garrett, 531 U.S. at 363.  In Guttman, the Tenth Circuit found "no question" that Congress intended Title II to abrogate state sovereign immunity because the ADA specifically provides that "[a] state shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter."  Guttman, 669 F.3d at 1117 (citing 42 U.S.C. § 12202).  The Court must therefore determine whether Congress' intent to abrogate state sovereign immunity is a valid exercise of its enforcement power under Section 5 of the Fourteenth Amendment.  In City of Boerne, the Supreme Court held that to answer this question, courts must consider (1) the nature of the constitutional right at issue; (2) the extent to which Congress passed Title II of the ADA in response to a documented history of relevant

-21-

constitutional violations; and (3) whether Title II is "congruent and proportional" to the specific class

of violations at issue, given the nature of the relevant constitutional right and the identified history of

violations.  Guttman, 669 F.3d at 1117 (citing City of Boerne, 521 U.S. at 529–36, and Lane, 541 U.S.

at 522, 529–30).

Courts must assess Eleventh Amendment abrogation on a case-by-case basis with respect to the

particular governmental services at issue in the case.  Guttman, 669 F.3d at 1117; City of Boerne, 521

U.S. at 527 (considering specific history of discrimination in area of access to courts); see also Garrett,

531 U.S. at 365 ("as applied" test requires court to identify with some precision scope of constitutional

right at issue).  This case-by-case approach is especially important in the Title II context, because Title

II "reaches a wide array of official conduct in an effort to enforce an equally wide array of constitutional

guarantees."  Guttman, 669 F.3d at 1117 (citing Lane, 541 U.S. at 530) (considering Title II remedy as

specifically applied to discrimination involving fundamental right of access to courts).

In Guttman, the Tenth Circuit noted that some Circuits read Lane to conclusively establish that

Title II in general survives the first two prongs of the inquiry (the scope of the right and the historical

record) in all cases.  Guttman, 669 F.3d at 1117. [19]  The Tenth Circuit, however, held that Lane requires

a court to analyze all three prongs with regard to the particular right and class of state action at issue.

Id. at 1117 (citing with approval Toledo v. Sanchez, 454 F.3d 24, 35 (1st Cir. 2006)).

---

[19]     The Tenth Circuit noted that the Fourth, Fifth, Eighth and Eleventh Circuits have concluded that Title II, taken generally, meets the first two prongs.  Guttman, 669 F.3d at 1117 (citing Klingler v. Mo. Dep't of Rev., 455 F.3d 888, 896 (8th Cir. 2006); Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 487 (4th Cir. 2005); Ass'n for Disabled Ams., Inc. v. Fla. Int'l Univ., 405 F.3d 954, 958 (11th Cir. 2005); McCarthy ex rel. Travis v. Hawkins, 381 F.3d 407, 423 (5th Cir. 2004)).

a) <u>Scope of the Constitutional Right</u>

Under the first prong of the <u>City of Boerne</u> analysis, the Court determines the nature of the constitutional right at issue and the related class of state action.  In <u>Guttman</u>, the Tenth Circuit found that unlike the right of access to the courts in <u>Lane</u>, a disabled individual's right to practice a chosen profession does not invoke heightened scrutiny.  669 F.3d at 1117 (although liberty component of Due Process Clause includes some generalized due process right to choose one's field of private employment, right is subject to reasonable government regulation); <u>see</u> <u>Conn v. Gabbert</u>, 526 U.S. 286, 291-92 (1999)).  The Tenth Circuit then stated that "the same is true with disability discrimination: a state's decision to treat the disabled differently than others "cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose."  669 F.3d at 1117 (quoting <u>Garrett</u>, 531 U.S. at 366–67) (further quotations omitted); <u>City of Cleburne</u>, 473 U.S. at 442 (persons with disabilities not suspect class).

b) <u>Historical Record of Constitutional Violations</u>

The Court next considers the extent to which Title II was "responsive to, or designed to prevent, unconstitutional behavior."  <u>City of Boerne</u>, 521 U.S. at 532.  "With respect to Title II generally, <u>Lane</u> settles the issue."  <u>Guttman,</u> 669 F.3d at 1118 (Congress enacted Title II against backdrop of pervasive unequal treatment in administration of state services and programs, and specifically considered evidence of discrimination in education, access to courts, transportation, communications, health care and other public services) (citing <u>Lane</u>, 541 U.S. at 524).[20]  Although Title II may validly abrogate state sovereign immunity in some instances, however, the Court must consider

---

[20]        In <u>Lane</u>, the Supreme Court acknowledged the "sheer volume of evidence demonstrating the nature and extent of unconstitutional discrimination against persons with disabilities in the provision of public services," and concluded that it is "clear beyond peradventure that inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation."  541 U.S. at 528-29.

Congress' historical findings with respect to the particular services at issue in the case. Guttman, 669 F.3d at 1119 (citing Lane, 541 U.S. at 527).

In Guttman, the Tenth Circuit noted that when it enacted Title II, Congress did not identify a history of irrational discrimination in professional licensing. 69 F.3d at 1119 (citing 42 U.S.C. § 12101; S. Rep. No. 101–116 (1989); H.R. Rep. No. 101–485 pts. 1, 2, 3 & 4 (1990), reprinted in 1990 U.S.C.C.A.N. 267; H.R. Conf. Rep. 101–558 (1990); H.R. Conf. Rep. No. 101–596 (1990), reprinted in 1990 U.S.C.C.A.N. 565; Roe v. Johnson, 334 F. Supp.2d 415, 422 (S.D.N.Y. 2004)). The Tenth Circuit determined that "Congress has never specified a longstanding pattern of disability discrimination in professional licensing, much less any irrational discrimination that rose to the level of a constitutional violation."[21]   669 F.3d at 1119; Cf. Garrett, 531 U.S. at 370 (with respect to Title I, insufficient congressional findings to demonstrate pattern of state discrimination in employment of persons with disabilities). The Tenth Circuit thus found that "the history of unconstitutional discrimination against the disabled regarding their right to practice in their chosen profession, as reflected in the congressional record, is minimal. This alone suggests Title II likely does not validly abrogate sovereign immunity in the area of professional licensing." Guttman, 669 F.3d at 1110 (citing Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Savs. Bank, 527 U.S. 627, 646 (1999) (although lack of support in legislative record not determinative, "expansive" remedial measure at issue did not validly abrogate state sovereign immunity because record "at best offer[ed] scant support for Congress' conclusion that [states were violating the constitution]")).

_____

[21]    The Tenth Court in Guttman thus distinguished Lane: "[In Lane], Congress documented a lengthy history of discrimination in the access to judicial services and facilities, here there is no such specific history. The historical testimony supporting abrogation is far removed from the discrimination in the administration of public programs and services – namely, the repeated infringement of fundamental rights and denial of access to public facilities – that Lane found in Title II's congressional record." 669 F.3d at 1119.

c) <u>Congruence and Proportionality</u>

The Court finally asks whether Title II is congruent and proportional to the specific class of violations at issue, given the nature of the relevant constitutional right and the identified history of violations.[22]  In <u>Guttman,</u> the Tenth Circuit addressed this question in the context of cases implicating disability discrimination in professional licensing.  <u>Guttman</u>, 669 F.3d at 1120) (citing <u>Lane</u>, 541 U.S. at 530).  The Tenth Circuit found that even if were possible to "squeeze out . . . a pattern of unconstitutional discrimination by the States," the rights and remedies created by Title II would raise congruence and proportionality concerns.  <u>Guttman</u>, 669 F.3d at 1119.  In the context of professional licensing, the Tenth Circuit summarized the basis for its conclusion that Title II does not validly abrogate sovereign immunity, as follows:

> Ultimately, we are presented with a right that is not fundamental, very little evidence of a widespread pattern of irrational state discrimination in professional licensing, and a wide-reaching statute that inhibits a state's ability to safely and efficiently make professional licensing decisions.  Title II prohibits a significant range of state action in this realm that would easily survive rational basis review. Accordingly, in this instance,

---

[22]     The Tenth Circuit cited Supreme Court cases which addressed congruence and proportionality and struck down four separate pieces of Section 5 enforcement legislation, and then noted that in two more recent cases, the Supreme Court found that Congress had validly abrogated state sovereign immunity.  <u>Guttman</u>, 669 F.3d at 1121-22 (citing <u>Hibbs</u>, 538 U.S. at 724, 730 (upholding family-care provision of the Family and Medical Leave Act (FMLA) as applied to states because Congress sought to prevent discrimination against protected class of citizens); <u>Lane</u>, 541 U.S. at 531, 533–34 (upholding Title II  claims alleging denial of access to courts; finding that unequal treatment of disabled persons in administration of judicial services has long history despite legislative efforts to remedy problem of disability discrimination)).  The Tenth Circuit concluded that in cases which involved rights implicating heightened scrutiny, "it was easier for Congress to show a pattern of state constitutional violations than in cases which concerned legislation that targeted classifications subject to rational-basis review."  <u>Guttman</u>, 669 F.3d at 1222 (quoting <u>Lane</u>, 541 U.S. at 529). Although the Supreme Court has not set out "an easily administrable test for determining proportionality or identified the factors that a court should consider in assessing congruence," the cases indicate that "[w]hether a remedial provision is an appropriate response (<u>i.e.</u>, congruent and proportional) to a purported class of constitutional violations depends on how well-tailored the congressional remedy is to the nature of the right and the history of violations," 669 F.3d at 1122. Based on these principles, the trend is to find that "absent the need to vindicate a fundamental right or protect a suspect class, Congress may not abrogate state sovereign immunity." <u>Id</u>.

> Title II is "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." City of Boerne, 521 U.S. at 532.

Id. at 1124-25.[23] Guttman requires this Court to find that Title II does not validly abrogate the Kansas Board's sovereign immunity in the context of professional licensing. The Court therefore dismisses plaintiff's Title II claims against the State Board as well as plaintiff's Title II claims for money damages against the State Board members in their official capacities.

**C.**   **Plaintiff's Claim for Injunctive Relief Against The State Board Members And Employees In Their Official Capacities – Ex Parte Young**

Plaintiff seeks injunctive relief on his ADA claims against the State Board members and employees in their official capacities. In Ex parte Young, the Supreme Court carved out an exception to Eleventh Amendment immunity for suits against state officials seeking to enjoin ongoing violations of federal law. 209 U.S. at 168; see Crowe & Dunlevy, P.C. v. Stidham, 640 F.3d 1140, 1154 (10th Cir. 2011). By proceeding on the fiction that an action which seeks only prospective injunctive relief against a state official is not an action against the state itself, the Ex parte Young doctrine enables federal courts to "vindicate federal rights and hold state officials responsible to the supreme authority of the United States." Id. (quoting Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 105 (1984)). The exception, however, is a narrow one. First, there must be an "ongoing violation of federal law." Johns v. Stewart, 57 F.3d 1544, 1552 (10th Cir. 1995); Clark v. Stovall, 158 F.Supp.2d 1215, 1221 (D. Kan.

---

[23]   The Tenth Circuit found that, as applied to professional licensing, the Title II remedy "far exceeds what is constitutionally required in that it makes unlawful a range of alternate responses [to discrimination] that would be reasonable," and concluded that although Title II permits some flexibility by requiring only "reasonable efforts at accommodation," the statute's sweep is exceptionally broad, and that "abrogation of sovereign immunity here would require states to justify a significant range of rational, everyday licensing decisions that would otherwise be constitutional." Guttman, 669 F.3d at 1124-25. In contrast to many other public services, states have strong historical interests in medical licensing, which touches on the core governmental function of promoting and protecting the general public welfare. Id. at 1124.

2001).  Second, it applies only to prospective relief and may not be used to obtain a declaration that a state officer has violated plaintiff's federal rights in the past.  P.R. Aqueduct v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993).  Finally, it does not apply to suits against the States and their agencies, which are barred regardless of the relief sought.  Id.  Thus, under Ex parte Young, to the extent that plaintiff seeks a prospective injunction, he may maintain an action against individual defendants in their official capacities.  See Guttman, 669 F. 3d at 1127.

The State Board members and employees first assert that the Court must dismiss Counts I through V for injunctive relief because plaintiff has not alleged any *ongoing* ADA violations.  Counts I through V essentially allege that defendants violated the ADA because they failed to provide reasonable accommodations for plaintiff to take the nursing licensing examination in May of 2009 and thereby denied him the benefits of the licensing program on the basis of his disability.  Defendants point out that the one government employee who impeded plaintiff's quest for a license to practice nursing – Taylor – is no longer a state employee.  Further, plaintiff does not assert that Taylor was enforcing any formal policy of the Board.  Defendants thus argue that plaintiff has not alleged an ongoing ADA violation which the Court could enjoin.  The Court agrees that plaintiff has not alleged that any current State Board policy – or any on-going conduct by any State Board official or employee – violates the ADA.

The State Board members and employees also correctly point out that to the extent that Counts I through V allege that their *past* actions violated the ADA, Ex Parte Young does not provide any remedy.  Further, plaintiff does not ask the Court to grant prospective relief, such as an order that defendants allow him to re-take the examination with reasonable accommodations.  The Court finds that Counts I through V do not set forth viable claims for injunctive relief under Ex Parte Young.

Similarly, as to Counts VI and VII, the State Board members and employees assert that the

amended complaint does not describe any situation that could be remedied by injunctive relief directed to any state official.  Count VI alleges that the Kansas Defendants violated plaintiff's ADA rights by failing to provide an appeal procedure for those who took the NCLEX-RN examination.  Count VII alleges that the Kansas Defendants violated the ADA by failing to provide an alternative format for the NCLEX-RN examination.  Defendants point out that Counts VI and VII refer in the past tense to conditions which existed in 2009, and do not identify any current conduct that the Court could enjoin a state official to do or stop doing.[24]  Further, they note that plaintiff does not seek to re-take the test examination,[25] and thus injunctive relief directed to the State Board members and employees would not benefit him.  Again, the Court agrees that Counts VI and VII fail to set forth a viable claim for injunctive relief under Ex Parte Young.

### D.    Title II Claims Against Individual Defendants In Their Individual Capacities

The individual defendants assert that the Court must dismiss plaintiff's Title II claims against them in their individual capacities because they are not subject to liability under Title II of the ADA.  Plaintiff does not specifically respond to this argument.

Title II of the ADA prohibits discrimination against disabled individuals by public entities.  42 U.S.C. § 12132.  Title II defines "public entity" as "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government."  U.S.C. § 12131(1)(A) and (B).  The Court agrees that defendants in their individual capacities do not constitute a public entity, and plaintiff's claims against them in their individual

---

[24]    Further, defendants correctly point out that current Kansas law permits an applicant who has taken the examination without success to retake it, rendering Count VI moot.  See K.S.A. §65-1121a; K.A.R. § 60-3-106(d).

[25]    The State Defendants state that at the scheduling conference, Magistrate Judge James P. O'Hara asked plaintiff through his counsel to consider making a request for reexamination, but that in an email to Magistrate Judge O'Hara on August 12, 2011, plaintiff declined to do so.

capacities must therefore be dismissed.  See Jacobson v. Johnson Cnty. Cmty. Coll., No. 11-cv-2132-JAR-JPO, 2011 WL 4971422, at *3 (D. Kan. Oct. 19, 2011); Rix v. McClure, No. 10–1224–CM, 2011 WL 166731, at *6 (D. Kan. Jan. 19, 2011).  Cf. Butler v. City of Prairie Vill., 172 F.3d 736, 744 (10th Cir. 1999)  (individuals, such as employees, not covered entities under Title I of ADA).

**E.     Title III Claims Against Defendant National Council Of State Boards Of Nursing**

Under the provision of Title III of the ADA which governs professional licensing examinations, plaintiff brings two claims (Counts VI and VII) against the National Council.  See 42 U.S.C. § 12189. Count VI asserts that the National Council's failure to provide an appeal procedure for test applicants discriminated against plaintiff on the basis of disability.  Count VII asserts that the National Council's failure to provide an alternative to the CAT format for test-takers of the NCLEX-RN discriminated against disabled individuals, including plaintiff, by excluding them from the benefits of the license program.  The National Council asks the Court to dismiss these claims for lack of constitutional standing and failure to state a claim.[26]

Section 12189 requires that any person who offers examinations for professional licenses to "offer such examinations . . . in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." 42 U.S.C. § 12189.  Enyart, 630 F.3d at 1160. A private entity must administer an ADA-covered examination to "best ensure" that its results reflect "the individual's aptitude or achievement level or whatever other factor the examination purports to measure," rather than reflecting the individual's disability. 28 C.F.R. § 36.309(b)(1)(i).  Those offering such an examination must provide "appropriate auxiliary aids" for those with disabilities, 28 C.F.R. §

---

[26]     The National Council asserts that to the extent that Counts VI and VII allege that it violated 42 U.S.C. § 12132, they fail to state a claim because that section applies only to a "public entity."  § 12131(1)(A), (B).  Title III defines a "public entity" as a state or local government or department, agency, special purpose district or other instrumentality of same.  The National Council asserts that as a private, not-for-profit corporation, it is not a "public entity."  Plaintiff agrees.

36.309(b)(3), including additional time or an alteration in "the manner in which the examination is given," 28 C.F.R. § 36.309(b)(2), unless the modification would "fundamentally alter the measurement of the skills or knowledge the examination is intended to test or would result in an undue burden." 28 C.F.R. § 36.309(b)(3); see also Powell v. Nat'l Bd. Med. Exam'rs, 364 F.3d 79, 88 (2d Cir. 2004). When considering requests for accommodations, the testing entity must weigh documentation of past accommodations. 28 C.F.R. § 36.309(b)(1)(v).

A Title III claim requires that plaintiff establish that (1) he is disabled within the meaning of the ADA; (2) defendant is subject to the ADA; and (3) defendant discriminated against plaintiff within the meaning of the ADA. Roberts, 542 F.3d at 368. As to the third element, to claim that defendant discriminated against him under Section 12189, plaintiff must allege that he requested an accommodation and therefore put the entity on notice to trigger a duty to accommodate. Dudley v. Hannaford Bros. Co., 333 F.3d 299, 309 (1st Cir. 2003) (42 U.S.C. § 12182(b)(2)(A)(ii) requires person with disability to request reasonable and necessary modification, thereby informing operator of public accommodation about disability) (dicta); Shaywitz v. Am. Bd. of Psychiatry & Neurology, No. 09 Civ. 4387(VM), 2012 WL 266884, at *7-8 (S.D.N.Y. Jan. 27, 2012) (no viable claim where plaintiff failed to check box on billing statement that would have alerted Board to need for accommodation); Varad v. Barshak, 261 F. Supp.2d 47, 50 (D. Mass. 2003), aff'd, 99 F. App'x 255 (1st Cir. 2004) (plaintiff's claim for failure to provide test accommodations properly denied because she did not seek accommodation pursuant to established procedures).

**Standing**

The National Council asserts that plaintiff has failed to plead facts sufficient to establish his constitutional standing to assert claims against it. The National Council points out that Counts VI and VII of the amended complaint do not allege that plaintiff – or the State Board on his behalf – requested

-30-

an accommodation from the National Council,[27] or that the National Council failed to honor an accommodation granted by the State Board.  As a general rule, because constitutional standing is necessary to the Court's jurisdiction, the Court must address it before proceeding to the merits.  See Steel Co. v. Citizens For a Better Env't, 523 U.S. 83, 96–97, 97 n. 2 (1998).

> To establish Constitutional standing, plaintiff must allege that
>
> (1) [he] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;
> (2) the injury is fairly traceable to the challenged action of the defendant; and
> (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180–81 (2000).  At the pleading stage, general factual allegations of injury resulting from defendant's conduct may suffice.  See Carolina Cas. Ins. Co. v. Pinnacol Assur., 425 F.3d 921, 927 (10th Cir. 2005) (each element must be supported with manner and degree of evidence required at particular stage of litigation).

The National Council argues that because plaintiff has not alleged that he requested an accommodation from it, he has not alleged injury in fact.  See D.L. v. Unified Sch. Dist. No. 497, 596 F.3d 768, 774 (10th Cir. 2010) (affirming dismissal of ADA claim with respect to school district nonresident admissions policy for lack of standing because plaintiff never sought admission as nonresident).  Further, the National Council argues that plaintiff has not alleged that the injury is traceable to its action, as follows:

> Plaintiff does not allege that the asserted problems in the administration of the test to him in May 2009 are in any way related to, or caused by, the alleged general flaws in the CAT format related to candidates with test anxiety, in general, or to his asserted disability, in particular.  Nor does he allege that he failed the May 2009 examination

---

[27]    As to Count VI, the National Council argues that "[l]ikewise, Plaintiff's assertion that he sought but was denied some sort of unspecified 'appeal' with [the National Council], . . . cannot state a claim under the ADA because there is no denial by [the National Council] of any request for an alternative test format accommodation from which to appeal."  Doc. #29 at 5.

> because of any asserted problems in its administration or its CAT format.  He even fails
> to allege that the asserted CAT format flaws cause candidates, with claimed test anxiety,
> to fail disproportionately the exam because of their test anxiety rather than their lack of
> knowledge, skills and ability.  In sum, the Amended Complaint is completely devoid of
> any assertion that [the National Council's] alleged failure to provide an alterative format
> for the NCLEX-RN Examination caused him any harm.

The Court agrees that plaintiff lacks standing to assert the claims against the National Council because

he has failed to allege a causal link between its alleged conduct and any harm to plaintiff.  The Court

therefore dismisses plaintiff's claims against the National Council.

**IT IS THEREFORE ORDERED** that Defendant National Council of State Boards Of Nursing,

Inc.'s Motion To Dismiss (Doc. #28) filed September 19, 2011; the Motion To Dismiss (Doc. #30) filed

September 19, 2011 by the State Board and its officers and members; and the Motion Of Defendant

Blubaugh To Dismiss (Doc. #46) filed November 14, 2011 be and hereby are **SUSTAINED**.

**IT IS FURTHER ORDERED** that the Motion Of Certain Defendants To Quash Untimely

Service Of Process (Doc. #47) filed November 14, 2011 be and hereby is **OVERRULED**.

Dated this 24th+ day of April, 2012 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge